The first case on today's docket is the case of County of St. Clair and the Sheriff of St. Clair v. Ill. Labor Relations Board State Panel, Illinois Fraternal Order of Police, Labor Council We have Mr. Brian Mannion for the appellant. And we have Mr. John Roche Jr. and Mr. Eric Truitt for the affilies. And I understand you've already arranged for a split of your time, so you'll be on top of that. So at this point, if you're prepared to extend Mr. Mannion, you may do so. State Panel, Illinois Fraternal Order of Police, Labor Council May it please the Court, and may it please Mr. Roche and Mr. Truitt. This case arises out of a Hunter labor practice charge brought against the employer, the County of St. Clair and the St. Clair County Sheriff, by deputies who are employed by the County and the Sheriff. The deputies are sworn peace officers, and under the Illinois Labor Relations Act, when the deputies and the employer reach an impasse in contract negotiations, there's special procedures that govern what happens. And that's because the deputies are peace officers and they're not allowed to strike. So whenever an impasse is reached, there's a process for mediation and interest arbitration, and interest arbitration will resolve the impasse issues. Part of Section 14 of the Act provides that once interest arbitration proceedings get started, the parties all have to maintain the existing wages, hours, and other conditions of employment. So the issue before this Court is, first, what does that mean to maintain the existing wages, hours, and terms and conditions of employment? So under 14L, the Village of Oak Park case was recently decided by the Court in interpreting this specific language. Could you speak up just a little, because we are recording, and it's in your benefit to- I apologize. No, no problem. I'll try to do better. The Village of Oak Park case was a 2009 case decided by the Labor Relations Board, and it addressed the precise issue. Under 14L, what is the status quo? It says the primary indicator of the status quo is the expired collective bargaining agreement. So where the expired collective bargaining agreement addresses the particular issue, if you're complying with the expired collective bargaining agreement and reverting back to it, that's not an unfair labor practice. If the expired collective bargaining agreement doesn't address the particular issue, then you can look to past practices. But what's improper is to present a status quo that ignores the expired collective bargaining agreement. So in this case, the Labor Board and the union make no attempt to distinguish the Village of Oak Park case or even address it in either of their briefs, and it's directly on point. The Board cites to the Village of Maywood case, which is a 1994 case, for the proposition that what 14L is really talking about is when you're looking at the existing wages, hours, and terms and conditions, you're looking at is there a mandatory duty to bargain under Section 7 of the Act. However, that's a misinterpretation of what the Maywood case holds. What Maywood says is it reiterates the same rule as Village of Oak Park. The primary indicator of status quo is the expired contract and then past practices. What it then goes on to say is if the action taken violates the expired bargaining agreement more than past practice, it still might not be an unfair labor practice. You then have to look at Section 7, and if it's not a mandatory topic of bargaining, then there's still no unfair labor practice. So there could be a term in a contract or a past practice that is merely a permissive topic of negotiation. So if the parties had agreed, for example, that the employer would levy a certain amount of tax, that would be a permissive area of bargaining that could not go to interest arbitration. So even though that may be in the expired contract or a past practice, there's still no unfair labor practice under Section 14L because it's permissive. It doesn't say that you just look at is this a mandatory subject of bargaining, and that's the only inquiry. Furthermore, the Village of Maywood case is only a decision of an administrative law judge. It was not a decision of the board, so it's non-binding and it's non-precedential. And also, this whole discussion of Village of Maywood is actually just dicta because the parties agreed that the issue in that case, there was a mandatory topic of bargaining. So moving on, the court applying Village of Oak Park has to find or should find that if the employer complied with the expired contract, there was no unfair labor practice. So at the board level, this issue came up and the board construed this whole argument that the employer complied with the contract as an affirmative defense. Now, this is not at all an affirmative defense. The union has the burden of proof proving that the employer failed to maintain the existing wages, hours, and terms and conditions of employment. So essentially, the employer's argument is just simply we didn't fail to maintain them. We did maintain them. We complied with the contract. So at issue is the management rights clause in this contract, the expired contract. Section 2.01, the parties specifically agree management has the right to do a number of different things. Among these things are determine job classifications, assign and transfer bargaining unit work. So that's exactly what the issue is here today. At a point during interest arbitration proceedings, the sheriff established a new job classification. The new job classification was Metro Patrol Deputy. This job classification was solely focused on performing an assignment of patrolling the Metrolink trains that run through St. Clair County that are operated by Bi-State. The sheriff and the county provide these services essentially as a contractor to Bi-State. So its decision to do this followed to a tee Section 2.01 of the expired contract. The union didn't even allege and didn't offer any argument whatsoever at any point that the employer has failed to comply with the expired contract. Their whole argument is premised on there's a duty to bargain and ignore the expired contract, which is improper under the village of Maywood and it's improper under village of Oak Park. So the union had the burden of proof on this issue and the employer offered evidence that we complied with the contract. So it's essentially like in an auto negligence case, if a plaintiff alleges in their complaint that a defendant negligently disobeyed a traffic control device and entered an intersection and caused an accident, and the defendant says, I had a green light, that's not an affirmative defense. That's negating an element of the plaintiff's positive action. And that's exactly what the case is here before the court today. The compliance by the employer with the expired contract is their green light. What we did was permissible. So it's not assuming is true or taking as true the allegation in the complaint for hearing that employer's actions failed to maintain the existing terms and conditions of employment. It's directly attacking that and saying what we did didn't alter the existing terms and conditions of employment. Now, this particular issue of whether this constitutes an affirmative defense or not is an issue for the Dover review. I've cited for the court the Zook case, which addresses the precise issue of whether a particular argument or a set of facts is either an affirmative defense or is it merely attacking an element of the underlying claim. So, again, the union and the board have offered no response to the Zook case. They've offered no contrary case law suggesting that with this particular issue, that this isn't a topic for the Dover review. And, by the way, Zook also said that to determine if something is an affirmative defense or not, the test is does it take as true the allegations or not? And also Black's Law Dictionary defines an affirmative defense in that same manner. So, as a matter of law, the court should find that this will argument that the county and the sheriff complied with the contract was not an affirmative defense. So, if the court reaches that conclusion, the next inquiry is did the employer's actions, in fact, comply with the expired contract? And that's a pure issue of contract interpretation. The county's position is that the management rights clause is very clear. It specifically says management has the right to determine job classifications. Management has the right to assign and transfer work of bargaining unit members. So, I don't understand any way that that language could be read to prohibit the conduct of the employer in this case. The employer set forth that that was their reasoning and their authority for making this change from the very start. Before they instituted this change, they prepared a document called the Establishment of the Metro Patrol Division. And it specifically cited this as being established under 2.01 of the expired contract. Furthermore, the contract had an integration clause. It said that this is the whole agreement of the parties. So, the court should look at the four corners of the document and tell there's got to be some significance to the parties agreeing that these items are management rights. And the significance is that these are things management can do without further negotiation. I believe the court can resolve the issue just on that basis and determine that there was no unfair labor practice because the county's actions and the sheriff's actions complied fully with the contract. However, if the court finds that that's not the case, then the issue becomes was there a duty to bargain? This is a totally separate issue whether under the Act there is a duty to bargain in this decision. And this involves an application of the Central City Test of the Illinois Supreme Court. So, under the Central City Test, if an item is a management right, but it also affects the terms and conditions and wages of the employees, then there's a third prong analysis in which the benefits of bargaining are balanced against the burdens on the employer. In this case, the Central City Test was misapplied. Essentially, instead of doing a fair balancing test, what the administrative law judge did was simply say, is this an economic versus a non-economic issue? It determined that ALJ determined it was an economic issue and then basically speculated that with an economic issue, theoretically, a union could always make some proposal that would address an economic concern. So, it essentially bypasses doing a balancing test. The analysis says, is it economic or non-economic? If it's economic, you could always theorize that the union members will take a wage cut, so there's always a benefit to bargaining. So, essentially, if it's an economic issue, there's always a duty to bargain, and you only would ever get to a balancing test if it was a non-economic issue. This is a misapplication of Central City, and it's clear from the Central City analysis and the recommended decision in order of the administrative law judge, the judge puts directly in its recommended decision in order that it's basing its decision on speculation. Decisions should be based on evidence and facts in front of the court and testimony, not on speculation. And if there's any speculation, it should be for the benefit of the party that doesn't carry the burden of proof. So, the county puts it to the court that it's highly improper for the administrative law judge to speculate to help the union meet its burden of proof in this unfair labor practice charge. And then the final issue raised is whether the Maypole remedy is appropriate or not. The only evidence in this case was that the bargaining unit member's wages and benefits were never changed as a result of the action taken by the employer. Every bargaining unit member continued to be paid the exact same at all times and received the exact same benefits. There was no evidence whatsoever at hearing of economic loss to any bargaining member. The argument of the union is that to make them whole, they're entitled to all of the wages that the employer has paid to the two metro patrol deputies at all times. That would grossly, unjustly enrich the union and it would be purely punitive on the employer. It's not an appropriate remedy, especially in light of the fact that the whole decision in this case turned on a very nuanced application of the third prong of the central city test, balancing the burdens of bargaining against the benefits. So, it wasn't a clear black and white issue of right versus wrong. And one final point I would like to address, too. There's some confusion, I believe, in the briefs as to assertions that when the parties were negotiating, they were negotiating a proposal where the bargaining unit members would perform the metro patrol duty at a different set of benefits and wages. That was not the action that was taken by the employer. The employer did not change the benefits and wages for the bargaining unit members. Instead, it formed a new position and assigned certain duties to that new position. That's an action that's allowed by the management rights clause of the contract. They were two different things. They're related, but they're separate. It's just like a proposal to employees to take reduced wages is related to potentially a management rights decision to implement a layoff, if necessary. They're both related to a financial issue, but they're different. You can't, as an employer, unilaterally change the benefits and wages of employees. You've got to negotiate on that. But that affects the finances of the employer. If there's a financial crisis or problem, there's ways that the employer can address that through management rights, and that's what happened here. We attempted to negotiate wages for the bargaining unit to continue performing this job and this particular assignment at a different set of wages. They rejected that, so management took a different course of action and set up a new position. Thank you. Thank you, Mr. Mannion. You'll have the opportunity to rebuttal. Mr. Roach, I'm sorry, Mr. Truitt, you're going to begin. May it please the Court, I'm Aaron Truitt, Assistant Attorney General. I represent the Illinois Labor Relations Board. The argument that my friend was referring to is, in essence, an argument of contractual waiver. What he's saying is that, ordinarily, this may be a mandatory subject of bargaining. But because of a particular provision in the collective bargaining agreement, the union clearly and unequivocally waived its right to bargain on that issue. And the issue of waiver, because it relates to the union's intention in agreeing to a provision, cannot simply be resolved at reference to a particular contract language, unless that contract language is so clear that the union's intention to waive is so evident on the face of the contract that no testimony to the contrary could reverse that. So the reason why the board declined to reach this issue was because it felt that further factual development was necessary in order to determine whether the union actually intended to waive its right to bargain over this issue when it agreed to this particular provision in the contract. So, as a general matter, it's true that contract interpretation is defined through the four corners of the agreement. But in this context, what he's really arguing is an issue of intent. The union intended to waive its right to bargain over an issue that would ordinarily be a mandatory subject of bargaining when it agreed to this provision. I must recall this issue that he refers to was raised for the first time in his exceptions to the board's decision. So they had filed an answer. They had filed a statement of pre-hearing issues. They had filed a post-hearing brief. In any of those three stages, there was no reference to the idea that the union had contractually waived. It was only after the hearing and after the post-hearing briefs in their exceptions to the recommended decision that this argument was raised for the first time. And that's why the board deemed it forfeited. The board gave two reasons for this. The board said, first, this is an affirmative defense that had to be raised in the answer. But then the board gave a second reason. The board said, you raised this argument so late, it essentially deprived the other party and the administrative law judge of the opportunity to address this during the course of the proceedings. It's just as if a defendant had raised an objection to the evidence for the first time in a post-trial brief. You have no opportunity for rebuttal in the course of trial. You have no opportunity to offer a witness clarifying statement. So it wasn't simply that this was an affirmative defense and the board was applying a technical interpretation of its rules. You raised it in your pretrial statement of issues instead of in your answer. What the board was really saying is, you raised this issue so late in the proceedings that you deprived the party and the administrative law judge of the opportunity to sufficiently address this. And that's why this decision is ultimately reviewed for abuse of discretion, because the board was not simply making a legal finding. The board was making a discretionary finding that this issue was raised too late in the process and therefore should not be considered by the board. And it's analogous to the Wooddale decision. The Wooddale decision involved the board's decision whether or not the board would grant a variance in a particular case from its own rules. That's a classic discretionary decision. And Wooddale says we review that for abuse of discretion. And the same analogy should apply here. Even if the question about whether or not something is an affirmative defense is a matter of law, ultimately this is a discretionary decision. The board didn't simply say, we're not, this isn't an affirmative defense, therefore we can't possibly consider it because as a matter of board rules, affirmative defenses can only be raised in the answer. The board was exercising its discretion, saying maybe if you had raised this in your pretrial statement of issues or even in your post-hearing brief, we possibly could consider it. But it was raised so late in the process that in our exercise of discretion, we're going to decline to reach this issue. And that's why this should be reviewed for abuse of discretion, because it was not a pure legal issue. It was something where the board was looking at the effect on the parties and the effect on the board by denying it of the opportunity of the administrative law judge's reasoned opinion on the issue, and therefore it declined to reach the merits of that argument. So just in summary of that point, their argument is in essence contractual waiver. And under labor law, contractual waiver has to be clear and unequivocal, and that's really a question of the union's intent. So you can't simply look at this provision, which could be interpreted two different ways, and say, oh, I can tell from this provision that the union clearly and unequivocally intended its right to bargain over the issues in this case. And then secondly, when the board enforced its forfeiture rules, what the board was doing was exercising its discretion. It was really based on the principle that an argument raised too late unfairly deprives the parties of the opportunity to respond. The board did not reach the merits of the contractual waiver argument, so I will not discuss the merits of those as well. But it is important to realize that the board's forfeiture decision had those two components, and it's that second component, the issue that was raised too late, is why it's a discretionary decision that's reviewed for abuse of discretion. As to the merits of the central city test, it's important to recognize that section 14, a claim under section 14 is analyzed exactly the same as a claim under section 7. So take this case out of the interest arbitration context. Just assume that the employer made a unilateral change to a term and condition of bargaining. That would be unanalyzed under the central city test. A claim under 14L is unanalyzed under the same test. There's not a separate analysis about whether the employer changed the status quo. All it does is extend the same principles from section 7 all the way through the interest arbitration process. And the construction that he's trying to give to section 14L, as the board noted in its brief, would in essence apply one standard to section 14L and a different standard to section 7. Because the board has already said in the context of a section 7 claim, if you take interest arbitration out of the equation and the employer simply makes a unilateral change to a term and condition of employment while a collective bargaining agreement is in force, or there's no interest arbitration pending, the issue of contractual waiver is an affirmative defense for purposes of a section 7 claim. And we cited those cases in our brief. He's trying to say, well, if it's a section 14 claim, it's no longer an affirmative defense. It's instead an element of the proof. But this idea is inconsistent with the board's precedents that say section 7 claims are identical to section 14 claims. They're analyzed under the same set of rules, the central city test. And really the issue there is whether there was a unilateral change to the terms and conditions of bargaining. So his argument that this is not an affirmative defense is inconsistent with the board's holdings over the last several decades that section 14L is identical to section 7. It simply extends the same principles throughout the entirety of the interest arbitration process. The last thing I'd like to address is his claim that the board somehow misapplied the balancing test. The central city balancing test, the first step of the test is whether or not, you know, this affects hours, wages, terms and conditions of employment. I think that there's not a great deal of dispute that this decision affects the terms and conditions of employment. And the second is, is this also an issue of inherent managerial authority? And the board agreed that this was an issue of inherent managerial authority. So in the instances where you have a conflict, you have something that could be viewed as managerial authority, but could also be viewed as something that affects the terms and wages of conditions, you apply the third step of the test. And the third step of the test looks generally to whether an issue is amenable to bargaining. You don't look at the particulars of the case and see, well, the employer didn't bargain a lot about this issue in this particular case. So even though generally this issue is amenable to bargaining, because one of the parties did not bargain over it vigorously in this particular case, it wasn't a mandatory subject of bargaining. It's difficult to look at how an issue is bargained in a case to decide whether the issue had to be bargained over in the first instance. And that's why the court and the board looks at whether an issue is generally amenable to bargaining. You can't say, I mean, it makes little sense to say, well, because the parties didn't specifically bargain over an issue, that it's not a mandatory subject of bargaining. You instead look into whether an issue is generally amenable to bargaining, and economic issues are amenable to bargaining. And then you look at the second part of the balancing test, whether or not there's a burden on the employer's inherent managerial authority. And here, they have not identified any burden on the employer's inherent managerial authority from bargaining. There are cases in which such a burden is found. They typically involve an economic emergency or some other time-sensitive nature that would make it such that if the employer was forced to bargain over this issue, something of consequence would happen in the interim. There's a case that we cited in our brief dealing with the school bus contract. There was an employer that if they had to wait to bargain over an issue, in essence, children would not be getting school bus service. And so the board found that because of the time-sensitive nature of the issue, bargaining over it would be very burdensome to the employer. Here, there's no such burden on the employer to bargain over the issue. So even if the benefits of bargaining could not be said to be great, there's no burden on the employer to bargain over this particular issue. And therefore, the board correctly found that the benefits of bargaining outweighed the burdens on the employer. Mr. Rose? May it please the Court. The employers never took the position that they had the right to do this under the collective bargaining agreement when the parties commenced bargaining in this case. When the parties started sitting down to discuss the terms and conditions of employment for the successor agreement, the employer made a proposal to create a new position, paying people in that position less money and receiving diminished benefits. The employer never said, we can already do this, and then did it. That did not happen. The union rejected that proposal, reluctant to creating two classes of citizens in its collective bargaining agreement, and rejected it, which itself was a counterproposal to the employer's offer. The parties bargained to impasse. Impasse, in this case, since their police officers culminated in filing a binding interest arbitration, the parties were proceeding with this as an open issue, and the employer decided after the charge had been filed, and after it unilaterally implemented the new Metrolink assignment, that it was not going to present this issue to interest arbitration. Had they done so, this would have been resolved one way or another in the party's arbitration. The employer strangled the process by taking this subject out on its own. They never said, when they decided to take it off the table, that the contract already gave them the right to do it. Charge was filed, it went to hearing. The employer's opening argument, it did not state it had the right to do this under the collective bargaining agreement. In the employer's answer to the complaint, it never stated it had the right to do this under the collective bargaining agreement. In its post-hearing brief, after the administrative law judge's hearing, it never took the position that it had the right to do this under the collective bargaining agreement. It did not do so until it filed its exceptions. The record had been made, it was the first time that it raised this issue, that it had an expressed, clear waiver of the union's right to bargain over this in the Mandatory Rights Clause. Now, had it taken that position earlier in the process of the bargaining table, the union could not, if there was a clear waiver, the union could not be made to waive it in the future collective bargaining agreement, since waiving a statutory right is a permissive subject to bargaining. So the employer went around all that by just implementing it and not bargaining over the subject. The union, from the beginning, stated that it opposed this creation of this two-tiered system. The employer was on notice that it was under contention. The contract had expired. Had the employer sought to get the specific waiver, the burden was on the employer to get it into the contract or get some concession. When parties are bargaining, collective bargaining, they have a number of issues on the table, and each party ranks those issues and strives to obtain some of them, knowing that they're not going to obtain all of them. When one party or the other is allowed to red circle subjects of bargaining that affect their employees, the process is strangled. It's choked off, and one party is denied something they could discuss and trade and even agree to by unilateral action. And that's what happened in this case. The employer really believed that it had the contractual right to do this. It would have moved to defer the unfair labor practice. It never did that. We submit this was an afterthought argument. Now, this issue, for many years, our bargaining unit members who are deputies in St. Clair County have patrolled the metro rail lines. They continue to patrol. The employer had, for a few years, been getting less money from the metro rail system and had been contemplating doing something to address this diminished resource. So that's what expressly drove their decision to try to come up with some other kind of job classification. The point is not that they can't create a new job classification, but they have to bargain over what those employees are going to be paid and how they're going to be compensated and what are going to be their terms and conditions of employment. And the employer ripped that subject from the process. It was purely economic. They did it purely for economic reasons. They hired new employees, paid them less money, paid them less benefits, paid them the same uniforms. These new employees are sworn peace officers and work side by side with the powers vested in them. Wasn't there something in there about they were only hired by attrition, on account of attrition? Our bargaining unit members continue to patrol the rail lines. But I thought the new hires were not made until after there was an attrition. No, they hired two to three new employees to perform, and they basically worked side by side. The numbers, my understanding is, have hovered around 11 or 12 sworn officers from Sinclair County patrolling these lines. So they, I believe, I think there are 13 now, two of these Metrolink employees, plus 11 or 12 deputies. They wear the same uniforms, they all have the powers of arrest, they do the same thing. The employer, in doing this, has diminished the composition of the bargaining unit, has taken what work has been certified for our members and starts to slow bleed out of the unit on its own and without bargaining over it. Well, I'm a little confused. I didn't think there were any more in numbers, except the ones that they hired only after the full deputies retired or left the force. Am I right or wrong? I don't know. My understanding is the numbers have remained about the same, given one or two. I don't think that there was this two leave. Oh, okay. I didn't know that. Okay. I do think that it's the employer's stated plan, that as people, our members come out of the unit, they will replace them with these new deputies. Okay, I understand that. So what this ultimately does is erodes the collective strength of the bargaining unit, and it's based on an economic, it's economically motivated. This is not driven on the employer's part. It's some sort of reorganization. This is not driven on the employer's part to create a bona fide supervisory position, which are two management rights exceptions under the central city. Another question I have, though, is were not the funds become smaller from Metro? Yes. So in other words, it might have been an even situation. As the funds went down, the wages went down on certain employees. Is that what happened? The employer had a contract with the Metro system, and the money that the Metro system gave the county diminished. Right. Over several years, this is not something that happened suddenly, and the employer had to fill the breach instantly. The money they were getting was getting less and less, and the employer was contemplating ways to address it, which is perfectly appropriate, but they need to bargain with us over how they can accomplish this. And when it's a subject for bargaining, there are tradeoffs under a whole menu of different things. But yes, and there are other departments that participate in the Metro rail line security, so Sinclair County is one public employer among several others who contribute to the security. Are those municipalities? Yes. Okay. So it was driven purely, though, by economic reasons, which particularly lends itself to the bargaining process. So there was nothing unique or tricky or urgent about this issue that did not lend itself to bargaining. And the parties were already at the bargaining table. They had been at it for over a year when the employer decided to unilaterally implement it. And they're required to bargain over this under the cycle city analysis. This was not covered under the collective bargaining agreement. Thank you. Thank you, Mr. Roach. Thank you both for your arguments, and you have the opportunity to bring up Mr. Manning. Thank you. I'd like to first address some issues raised by the board. The first time this issue of employers' position that their establishment of Metro Patrol complied with the contract came up was before the hearing ever occurred. Ten days before the hearing, the employer provided the union with its establishment of Metro Patrol document, which clearly stated Metro Patrol provision was established under 2.01 of the expired collective bargaining agreement. So they were aware of that before hearing. There's no merit to any other argument on that point. Also, I want to address another related issue. The union contended that the employer never told them at the bargaining table, if we don't work something out here, we're going to exercise our management rights and create a new division. That's not correct. Page 137 of the transcript, Major Thomas Knapp, the employer's representative, testified that the union was told in negotiations it was employers' right, under the management rights clause, to create a new Metro Patrol division. Again, at the hearing, the administrative law judge should have read Exhibit 9, which said the division's being set up under 2.01 of the management rights clause. The union could have questioned Major Knapp right then and there about, so you're contending that this was done consistent with the expired collective bargaining agreement. They didn't do it. They bear the burden of proof. That was their problem that they missed that issue. I want to also address this argument that this wasn't a permit of defense that had to be raised. Again, this argument is no different than saying in an auto negligence case, it's not good enough to deny that you ran through a traffic control device. You have to say the light was yellow. You have to say the light was green. You have to say I wasn't the one driving. Again, that puts the defendant in an incredibly awkward position. You have to anticipate when you're filing your answer whether the administrative law judge and its recommended decision in order is going to make a legal error or miss some issue, and that's just not the way the case should be. We should be allowed to deny the allegation and hold the union to their proof. The board and the union cite no case law that says failure to make an argument in a pre-hearing or post-hearing memorandum is a waiver. Again, that's just like in a bench trial. An opening statement or a closing statement isn't evidence, and that doesn't waive the right to claim that the later judgment isn't supported by evidence, which is essentially what this sort of argument is. In this case, I want to make clear the union made no proposal in negotiations to alter Section 2.01 of the contract. They could have proposed to take away or eliminate as a management right the employer's right to determine job classifications or transfer and assign work. They didn't make any proposal to do that. They could have submitted that to interest arbitration as well, and it would have been their burden to prove that the change was necessary. So there was no proposal from them to do that. So essentially they're trying to diminish our contractual rights and go around that, which is improper. This is not a purely economic issue. This affects standards of service. If the sheriff has to perform a contract at a loss, he has to divert resources from other places. He has to take resources from the jail, from court security, from the road patrol, because what it costs him to put deputies on the metro patrol isn't being paid by Bi-State. So it's not a purely economic issue. It's also a standard of service issue, because operating that contract at a deficit has to take away from something else. Road work is also different from metro work. There was a lot of evidence presented at the hearing on this. There are far fewer felony arrests for deputies performing metro patrol than road patrol work. What the metro patrol deputies do on their shifts, it's all governed by the police services agreement. So there's really much less discretion as far as what they do. The contract mandates, for example, that they spend 80% of their time on the trains. Again, saying that this is all the same work is like saying the job of a felony prosecutor is the same as the traffic court prosecutor. They're both prosecution, but it's a different kind of prosecution work. Thank you very much. Thank you. Thank you, Mr. Mannion. Thank you all for your briefs and arguments. We'll take the matter under review.